Case 4:14-cv-03084   Document 66   Filed in TXSD on 09/15/16   Page 1 of 8

United States District Court
Southern District of Texas
**ENTERED**
September 15, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**IN RE WILLBROS GROUP, INC.
SECURITIES LITIGATION**

CIVIL ACTION NO. 4:14-CV-3084

Honorable Keith P. Ellison

### MEMORANDUM AND ORDER

Before the Court is Defendant's Motion for Reconsideration (the "Motion").

### I.  BACKGROUND

In this class action, Plaintiffs are seeking recovery for alleged misstatements made by Defendants in filings required by securities laws, and in press releases and oral discussions by management of Defendant Willbros Group, Inc.

Defendants filed a Motion to Dismiss, seeking dismissal of Plaintiffs' claims for relief because the alleged misstatements were, for various reasons, not actionable under governing law. The Court held a hearing on the Motion and granted most of the relief Defendants were seeking. However, the Court declined to grant Defendants' Motion as to seven of the alleged misstatements. Defendants subsequently filed a Motion for Reconsideration as to the alleged misstatements that were not dismissed.

The Federal Rules of Civil Procedure do not expressly provide for motions for reconsideration, but the Court will assume that Defendants are seeking relief pursuant to Fed. R. Civ. P. 59. As the Fifth Circuit has made clear, reconsideration "is an extraordinary remedy that should be used sparingly." *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 479 (2004). "To succeed on a Rule 59(e) motion, a party must clearly establish at least one of the following factors: (1) an

1

intervening change in the controlling law, (2) the availability of new evidence, or (3) a manifest error of law or fact." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 2012 WL 3069844, at *2 (S.D. Tex. July 27, 2012). Here, Defendants do not adduce any law or evidence that was unavailable when Defendants' Motion to Dismiss was first ruled upon. Nor do Defendants seem to acknowledge that their motion was overwhelmingly successful in that it eliminated a majority of the alleged misstatements for which Plaintiffs originally sought relief. Nonetheless, the Court will review briefly the seven relevant misstatements to determine whether it made a manifest error of law or fact in refusing to dismiss the alleged misstatements from Plaintiffs' Second Amended Complaint (the "Complaint").[1]

## III.   ANALYSIS

### A.   Statement 16

Statement 16 consists of several, generally positive statements about pipeline projects that management made during a conference call with investors on August 5, 2014 to discuss Willbros's results from the second quarter. Specifically, Defendant Randy Harl noted that Willbros (the "Company") had incurred a substantial operating loss on the Seaway pipeline project, but assured investors that the Company had "assessed the other three [pipeline] projects and [was] confident the contributing factors [were] confined to [the Seaway] project." (Doc. No. 43 ("Complaint") at ¶ 273.) He then reiterated, "the key thing is that the things that happened on [the Seaway] project . . . weren't systemic to the business" and "are things that we can and have fixed" after having "done a very thorough assessment." (Complaint, ¶ 274.) The problems were a "one time thing." (Complaint, ¶ 274.) Defendants contend that these allegations do not give

---

[1] The Court will use the numbering employed at the hearing, which is, in turn, taken from Exhibit 2 to the Complaint.

rise to the requisite strong inference of scienter, and that the Court should dismiss the statement as a result. (Doc. No. 58 ("Motion") at 8.)

Two of the Complaint's allegations are at particular issue. One concerns a statement made by Mr. Fournier in October to the effect that pertinent negative information about the pipeline projects was "evident" and "apparent" by the end of June—which is to say in ample time to have been disclosed during Defendants' August conference call. (Complaint ¶ 135.) Defendants argue that Mr. Fournier was simply stating that these issues were apparent to the *project team*, not to senior management (*i.e.*, to Defendants).

Defendant's reading is certainly plausible, but other readings—including the Plaintiffs' reading—are also compelling. Indeed, Mr. Harl himself noted on the August 5th call that his comments were based on a "very thorough assessment" of the pipeline projects, (Complaint ¶ 274), so it seems logical to conclude that management was aware of the significant problems with the Allegheny pipeline project. The Court consequently finds a strong inference of scienter and, accordingly, that it is inappropriate to grant Defendants' Motion as to Statement 16.

One of the other allegations relied on by Plaintiffs is from a confidential witness who said that he had previously spoken directly with Mr. Welch, who was on the August 5th conference call, about cost overruns for equipment. Defendants contend that it is not at all clear from the Complaint what exactly the witness told Mr. Welch. Again, this is true, but this uncertainty about exactly what was said and when is better resolved after some discovery rather than on a motion to dismiss. Moreover, as Plaintiffs correctly noted in their briefing, (Doc. No. 61 at 16), other allegations in the Complaint further satisfy the Court that, as to Statement 16, Defendants' Motion must be denied.

B.     Statement 18

Statement 18 concerns certifications regarding internal controls made by management as required by Sarbanes-Oxley in the second quarter 2014 Form 10-Q.  Defendants appear to concede the certifications were misleading, but argue that Plaintiffs have not adequately pled scienter.

Defendants may very well prevail on this argument at summary judgment.  But the Court is daunted by the notion that, at this stage and on this point, it can dismiss Plaintiffs' Complaint.  The Complaint alleges performance problems as early as 2013, and, as discussed above, Mr. Fournier has admitted that these "project issues . . . were evident at the end of June [2014]." (Complaint ¶ 135.) Moreover, he specifically noted that it was "apparent that the business unit did not have all of the necessary project controls in place for . . . the work that was being done." (Complaint ¶ 135.)  And this is all in addition to the allegation that Sunoco contacted senior management regarding problems in mid- to late-July.

Defendants argue that, even if these allegations suggest that they knew about the problems with the pipeline projects, it would be an impermissible jump to infer that Defendants knew (or were severely reckless in not knowing) that the problems were attributable to inadequate internal controls.  But, as Plaintiffs correctly respond, Defendants had been acutely focused on their control procedures, both internally and in their statements to the market. Indeed, Defendants had repeatedly touted their improved internal controls as driving improved project performance.  (*See* Complaint ¶¶65-73, 76, 80-81, 65-106, 131-156.)  To the extent that Plaintiffs have adequately alleged that Defendants knew of significant problems on multiple pipeline projects, it would have been at least severely reckless for Defendants to refuse to

similarly acknowledge that poor internal controls might be driving their pervasive cost overruns and other project mismanagement.

### C.  Statements 19 - 21

In their Motion for Reconsideration, Defendants seem especially concerned with Statements 19 through 21.  These statements deal with the terms of Mr. Harl's separation from Willbros, whether the terms were accurately conveyed to the market, and whether—even assuming misstatements were made—that matters for legal purposes.  In their Motion, Defendants stress that, "Executives 'resign' all the time, whether because they are told or asked to, they feel pressured to, or they want to.  And it is an everyday occurrence for companies to publicly disclose all of these simply as 'resignations.'  The situation is no different here."  (Mot. at 5 (internal citations omitted).)  Defendants then take the argument one step further: "Moreover, whether or not an executive's resignation was voluntary is immaterial.  When faced with allegations that a company's account of the resignation of its CEO was materially false or misleading because it 'stated publicly that [the CEO] was leaving for personal reasons,' when in reality 'he was forced to resign,' the Ninth Circuit held that the statements were immaterial as a matter of law."  (Mot. at 6 (quoting *In re Foxhollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802, 805 (9th Cir. 2009).)

The Court would not controvert the Ninth Circuit on this point.  There are, no doubt, many circumstances in which the announced "resignation" of one or more corporate officers in senior management would be absolutely immaterial.  But the question before the Court is much narrower: whether the public statements made about Mr. Harl's "retirement" were material to the market in this specific circumstance.  If the problems with Willbros had already been fully disclosed to the public and there was clear market awareness that the company was in financial

difficulty, any statements about a senior manager's status might well be immaterial. Or perhaps if Willbros had simply stated that Mr. Harl was resigning, effective immediately, the Court could deem the statement to be the type of "ubiquitous," "transparent," and "pro forma" statement that was at issue in *Foxhollow*, a case upon which Defendants heavily rely.

But the circumstances and statements here differ markedly. In *Foxhollow*, the CEO announced that he was resigning for personal reasons—a statement that has become something of a euphemism in the business world—and investors consequently inferred "that something was amiss." *In re Foxhollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802, 805 (9th Cir. 2009). The stock price dropped the following day. *Id.*

Here, Defendants represented that Mr. Harl was *retiring*—not resigning—and that some of his duties would be transitioned to Mr. McNabb "to ensure a smooth transition." (Complaint ¶ 291-94.) In other words, Plaintiffs portrayed Mr. Harl's departure as a benign succession of executives spurred by a long-planned retirement. But in reality, Plaintiffs allege, Mr. Harl was effectively stripped of his duties because of the Company's dismal performance.[2] Investors would have found this distinction material.

Once again, discovery may provide a clear reconciliation of all the different statements. Mr. Harl's deposition may be especially telling. For now, however, the Complaint makes a sufficient showing of materiality to deny the Motion to Dismiss as to Statements 19 through 21.

---

[2] As was discussed at the hearing on Defendants' Motion to Dismiss, in Willbros' 10-K for 2014, the company indicated that the appointment of a new CEO was an effort to remedy the "unacceptable" performance of the oil-and-gas segment. (*See* Complaint ¶ 158.) Moreover, allege Plaintiffs, the Company asked Mr. Harl to waive benefits to which he would have been entitled in the event of an involuntary termination.

D.     **Statements 22 - 23**

Statements 22 and 23 were made during the same time frame as Statements 19 - 21. Statement 22 was a press release in which Mr. McNabb said, "Under [Harl's] leadership, we have assembled a strong team with complementary skill sets and experience to move the Company to the next level of operational performance." (Complaint ¶ 291.) In Statement 23, Mr. McNabb said, at an energy conference, that "It's a big turnaround for us right now, after having really gone out in a big way into the regions. And we haven't performed very well, and that's going to change. And, it's changing this year, with the performances really improving. We're going to have a $40 million improvement in operating margin this year and operating operations. So, Oil & Gas segment, cross country still looks good." (Complaint ¶ 50.)

Defendants contend that the Court erred in not ruling in their favor as to these statements because they are simply non-actionable puffery. The difficulty with Defendants' argument, however, is that both Statements intertwine forward-looking and backward-looking references. Statement 22 praises Mr. Harl's leadership and the strong team he had assembled, even though, as already noted, the subsequently issued 10-K said that a leadership change had been necessary because of the unacceptable performance of the oil and gas segment. Did the "unacceptable performance" by Mr. Harl also include the people Mr. Harl had hired? If so, why was Mr. McNabb referring to them as a "strong team"? This is yet another example of Defendants allegedly downplaying the circumstances of Mr. Harl's departure, which was material (and misleading) for the reasons explained above.

Statement 23 refers to "the performances really improving." It is at least reasonable to read that statement as meaning that the improvement in performances was already happening. If that is a reasonable reading, then the statement is not forward-looking.

## IV. CONCLUSION

Defendant's Motion to Dismiss is denied.

**IT IS SO ORDERED**.

Signed this 15th day of September 2016.

Hon. Keith P. Ellison
United States District Judge