UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re WILLBROS GROUP, INC. SECURITIES LITIGATION | § § § | Master File No. 4:14-cv-03084-KPE |
| | § | CLASS ACTION |
| | § | |
| This Document Relates To: | § § | |
| ALL ACTIONS. | § § | |
| | § | |

**DECLARATION OF DENNIS J. HERMAN IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
APPROVAL OF PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN
AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO LEAD
PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

## TABLE OF CONTENTS

**Page**

I.     SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT ..........................1

II.    PROCEDURAL HISTORY.................................................................................10

     A.     Pleading and Motion to Dismiss ................................................................11

     B.     Rule 16 and 26 Conferences ......................................................................15

     C.     Class Certification.....................................................................................16

     D.     Experts .....................................................................................................19

     E.     Fact Discovery .........................................................................................22

           1.     Document Production and Written Discovery...........................................24

           2.     Depositions ..........................................................................................25

           3.     Document Discovery from Third Parties...................................................26

           4.     Production Disputes Leading to Motions to Compel................................28

     F.     Motion for Reconsideration and Leave to Amend................................29

III.    NATURE AND ADEQUACY OF THE SETTLEMENT.................................31

     A.     History of Settlement Negotiations........................................................31

     B.     Strengths and Weaknesses of the Case ....................................................33

     C.     Reasons for Settlement .............................................................................37

     D.     The Proposed Plan of Allocation .........................................................39

     E.     Reasonableness of Fees and Costs ........................................................41

1445226_1

I, DENNIS J. HERMAN, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California, and am admitted to this Court, *pro hac vice*, for purposes of this litigation.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), one of the counsel of record for Lead Plaintiffs Wayne County Employees' Retirement System and City of Roseville Employees' Retirement System (collectively, "Lead Plaintiffs" or "Plaintiffs") and the Settlement Class in the above-entitled action (the "Action").[1]  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.[2]

## I.      SUMMARY OF LITIGATION AND REASONS FOR SETTLEMENT

2.      This securities class action was brought against Willbros Group, Inc. ("Willbros," "WG" or the "Company"), Randy R. Harl, Van A. Welch, and John T. McNabb ("Individual Defendants") (collectively, "Defendants") on behalf of the Settlement Class for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).  This case was vigorously litigated from its commencement on October 28, 2014, until the proposed settlement agreement was reached on February 20, 2018.

3.      Plaintiffs allege that Defendants deceived investors by concealing performance problems and financial losses on two of the Company's largest pipeline projects in 2014 and failing

---

[1]      All capitalized terms not otherwise defined herein have the same meanings as those set forth in the Stipulation and Agreement of Settlement, dated April 13, 2018 (the "Stipulation").  ECF No. 124.

[2]      The descriptions contained herein of the facts and events giving rise to this Action are based on the declarant's knowledge of this Action, including the evidence produced in discovery and other sources of information believed to be accurate.  The declarant does not have personal knowledge of the conduct of WG's business.  For a more detailed description of the alleged facts giving rise to this Action, see the Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 43) ("Complaint" or "SAC"), Plaintiffs' briefs in opposition to Defendants' motions to dismiss and for reconsideration (ECF Nos. 45, 61), and the Court's Order on the motion for reconsideration (ECF No. 66).

to reveal material weaknesses in its internal controls, including its inability to forecast the amount of liquidity needed to run the business. Plaintiffs allege that these conditions resulted in the restatement of the Company's 1Q14 and 2Q14 financial statements and the violation of the debt covenants in its lending agreements, leading to a massive restructuring of the business that left the Company teetering on the edge of bankruptcy. Plaintiffs contend that these actions caused Willbros' publicly traded securities to trade at inflated prices, thereby causing economic harm to Settlement Class Members when the risks and conditions concealed by Defendants' misrepresentations and omissions, or the economic consequences thereof, became publicly known, causing the Company's stock price to decline.

4.     The Settlement was not achieved until Plaintiffs, *inter alia*:

(a)     Investigated the facts and transactions giving rise to this Action to develop the detailed factual allegations necessary to plead claims for securities fraud in compliance with the Private Securities Litigation Reform Act of 1995 ("PSLRA");

(b)     Drafted and filed two consolidated and amended complaints and proffered a third amended complaint during the course of discovery;

(c)     Engaged in extensive legal and factual analysis to file detailed briefs in opposition to Defendants' motion to dismiss the Complaint, present oral argument on the issues raised therein, and defeat Defendants' motion for reconsideration of the Court's order denying, in part, the motion to dismiss;

(d)     Conducted detailed legal and factual analysis and discovery and filed three substantive briefs in support of certification of this Action as a class action, including by working with an expert retained to prepare a report and provide testimony on issues of market efficiency and to respond to Defendants' arguments over price impact, and taking and defending expert and fact witness depositions;

(e)     Completed more than 15 months of fact discovery, including production of 943 documents (nearly 15,000 pages) and responses to 13 interrogatories (each) propounded on Lead Plaintiffs, reviewing and analyzing more than 178,000 pages of documentary evidence produced by Willbros and more than 890,000 pages of documentary evidence produced by third parties, taking eight fact witness depositions in three different states, engaging in extensive meet-and-confers with Defendants over discovery disputes and the production of evidence, and researching, preparing and filing a motion to compel the production of evidence;

(f)     Prepared and filed a motion for reconsideration and leave to amend based on credible and compelling evidence produced in discovery supporting reinstatement of claims that had been dismissed on the pleadings, and proffering a third consolidated and amended complaint detailing that evidence;

(g)     Identified and retained experts to consult on and testify to issues of pipeline construction,  market efficiency, materiality, price impact, loss causation and damages, and analyze case issues and evidence; and

(h)     Continually assessed the risks of continued litigation and the prospects for settlement.

5.     The Settlement of this Action was negotiated after extensive negotiations with Defendants with the assistance and oversight of Robert A. Meyer, a respected JAMS mediator with substantial experience in mediating claims arising under the federal securities laws.  Through careful and detailed consideration of the parties' positions as articulated at these sessions, and follow-up communications thereafter, Mr. Meyer assisted the parties in negotiating the proposed Settlement of this Action and preparing the Stipulation and Agreement of Settlement that is now before the Court for approval.  The Settlement was reached as a result of an in-person mediation on December 5, 2017, in Los Angeles, and numerous follow-up discussions thereafter.  In advance of the mediation,

Plaintiffs and Defendants prepared comprehensive mediation briefs, supported by evidentiary materials, and vigorously advanced and defended their positions.  Although the parties did not reach a settlement during the December 5, 2017 session, Plaintiffs kept Mr. Meyer apprised of developments in the case that facilitated further negotiations between the parties and ultimately resulted in a mediator's recommendation to the parties that they settle the Action upon the payment of $10 million and the exchange of mutual releases.

6.       The proposed Settlement is the result of hard-fought and contentious litigation pursued by zealous advocates on both sides, and takes into consideration the significant risks specific to the case.  It was negotiated by experienced counsel for Plaintiffs and Defendants with a solid understanding of both the strengths and weaknesses of their respective positions.

7.       Lead Counsel and Lead Plaintiffs believe that this Settlement represents an excellent result for the Settlement Class in light of the claims advanced and the progress of the case and risks present at the time the proposed Settlement was agreed.  Based upon their factual discovery, investigation, research, analysis, and motion practice, Plaintiffs believed that their case had strong merit, but also recognized there were significant risks at trial, which had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms, or to continue to litigate through a trial on the merits and inevitable appeals process) was in the best interests of the Settlement Class. As set forth in further detail below, the specific circumstances involved here presented many risks and uncertainties as to Plaintiffs' ability to prevail if the case proceeded to trial.  Even if Plaintiffs were to win at trial, the risk of a years-long appeals process, during which time the Settlement Class would be denied any recovery, also was taken into account in evaluating the proposed Settlement.

8.       Plaintiffs' perseverance through four years of litigation resulted in the discovery of substantial evidence in support of the alleged claims.  We believed that discovery had revealed evidence sufficient to sustain a jury verdict in Plaintiffs' favor, including evidence that would

demonstrate that Defendants knew or recklessly disregarded facts that had not been disclosed to investors, including that: (i) repeated and extensive construction defects on the Seaway pipeline led to more than $18 million in repair costs that were deliberately concealed from investors; (ii) repeated and extensive construction defects and delays on the Sunoco pipeline led to millions more in costs that had not been timely disclosed to investors; and (iii) the Company lacked an effective system of internal controls to assure direct oversight of significant projects by top management, to assure that costs, performance, and profits were properly tracked and accurately reported, or to provide reasonable assurances over the accuracy of the Company's forecasts of the amount and availability of liquidity needed to operate its capital-intensive construction business in compliance with the debt covenants in its lending agreements.

9.      Despite the strength of the evidence developed in discovery, there were substantial risks to Plaintiffs' ability to obtain, protect, and recover on a favorable judgment at summary judgment or trial.  Defendants vigorously contested each of Plaintiffs' allegations, and planned to marshal evidence at summary judgment or trial they hoped would convince the Court or jury that, *inter alia*, their statements were true to the best of their knowledge; the risks had all been disclosed before their statements were made; the false and misleading statements were immaterial to investors; and that, if the fraud had occurred, it had not caused any recoverable damages to the Settlement Class.  Defendants also vigorously contested Plaintiffs' motions for class certification, for leave to amend or reconsideration, and to compel discovery, all of which were pending as the deadline for the completion of fact discovery approached at the end of March 2018.  At the time the agreement to settle was reached there was substantial uncertainty over the outcome of these disputes.  In addition to increasing the risks to obtaining an opinion or verdict in Plaintiffs' favor at summary judgment or trial, these issues gave rise to additional risks to Plaintiffs' ability to protect such a verdict on appeal.

10.     Even if the pending motions were resolved in Plaintiffs' favor, there were still numerous legal and factual disputes to be resolved by the Court or jury at summary judgment or at trial, the outcomes of which remained inherently uncertain.  Among the significant and potentially dispositive issues to be resolved were: (i) whether the Individual Defendants knew about or recklessly disregarded the problems on the Seaway and Sunoco projects; (ii) whether the Individual Defendants knew about or recklessly disregarded the failure to design and implement an effective system of internal controls over project management and liquidity; (iii) whether scienter could be imputed to Willbros from executives in its Oil & Gas segment, where the alleged fraud occurred, or from other individuals not named as defendants, and whether those individuals had scienter; (iv) whether Defendant Harl was forced to resign as a result of the negative consequences of the problems on the Seaway and Sunoco projects, or whether his and other executives' terminations were simply the result of planned transitions as the Company had represented; (v) whether Defendants knew about or recklessly disregarded the inability of the Company to reliably forecast its liquidity needs and ability to maintain compliance with its debt covenants; (vi) whether the alleged misrepresentations and omissions were material; (vii) whether the alleged misrepresentations and admissions caused class members to suffer damages; and (viii) whether the class could be certified.

11.     In addition, significant risks were presented because the claims arising from the Seaway project and Willbros' liquidity had been dismissed on the pleadings, and were dependent upon the grant of a motion to amend that was pending at the time of settlement.  Even if Plaintiffs had been granted leave to amend to reinstate the claims dismissed on the pleadings, there were significant risks that could reduce the amount of damages in the event that Plaintiffs prevailed on some, but not all, of their alleged claims.

12.     A finding that statements at some points in the class period were not misleading or not made with scienter could have shortened the class period, eliminating claims for some Settlement

Class Members and reducing the overall amount of damages recoverable in this proceeding. Damages were also subject to reduction if the jury determined that the August 4, 2014, October 21, 2014, November 12, 2014, December 4, 2014, or March 17, 2015 stock price declines did not result entirely from risks or conditions that had been fraudulently concealed from investors. For example, Defendants' expert had proposed to testify that the October 21, 2014 stock price decline resulted from the financial restatement and increased oil prices that dampened demand for construction of pipeline projects, rather than from a market reaction to the construction problems on the Sunoco pipeline project. While Plaintiffs believe they had substantial responses to these and other arguments Defendants intended to offer at trial, were the jury to credit any or all of Defendants' arguments, the damages recoverable at trial could have been significantly reduced or eliminated altogether.

13.     Plaintiffs anticipated a battle of the experts on these issues at summary judgment and trial. Each side had retained experts who would offer contradictory testimony regarding the information that was available to and relied upon by market analysts and investors, the reasons for the price movement in Willbros' securities, and the existence and amount of damages suffered by members of the Settlement Class. Even having retained experts who are among the most respected in these fields, there could be no guarantee that Plaintiffs would prevail on the issues of their testimony, as Defendants had also hired a respected expert to counter Plaintiffs' experts' theories. Indeed, the trial of this case could hinge on the testimony of experts, which presents a substantial risk of a party prevailing not on the merits but because of the jury's impression of one party's expert or experts.

14.     Even if Plaintiffs prevailed on all of these issues, there was a significant risk of delay in providing Settlement Class Members with compensation for the harm caused by Defendants' fraud. Summary judgment, *Daubert* motions, trial, and post-trial proceedings, including proceedings

attendant to the determination of damages, could have delayed recovery on any favorable judgment obtained at trial.  There was a substantial risk that Defendants would appeal any verdict achieved in Plaintiffs' favor.  In addition, class certification was also subject to appellate risk, including on issues of price impact that could have been affected by appeals that were pending in other cases at the time this Action was settled.  The appeals process could span years, during which time the Settlement Class would receive no recovery.  Any appeal would also create the risk of reversal, in which case the Settlement Class would receive nothing after having prevailed on the claims at trial.

15.     All of these factors, together with the other factors discussed herein, were considered by Lead Plaintiffs and Lead Counsel in concluding that the proposal to settle the Action for $10 million on the terms set forth in the Stipulation provided fair, reasonable, and adequate consideration in light of the risks and uncertainties of trial.  In reaching the determination to settle, Lead Counsel, in consultation with Lead Plaintiffs, evaluated the documentary evidence, deposition testimony, expert reports, and legal authority supporting Plaintiffs' allegations against that which Defendants believed undercut Plaintiffs' claims.  On balance, considering all the circumstances and risks both sides faced at trial, in addition to the Settlement Class' ability to collect on a final judgment, Lead Counsel and Lead Plaintiffs came to the conclusion that settlement on the terms agreed upon provided fair, reasonable, and adequate consideration for the claims alleged and was in the best interests of the Settlement Class.

16.     The Settlement confers a substantial benefit on the Settlement Class and eliminates the significant risks in pending motions for class certification, to compel further discovery, and for leave to amend, as well as the risks inherent at summary judgment and at trial and in post-trial proceedings and appeals, the outcome of which was far from certain.

17.     Lead Counsel has, as described below, vigorously prosecuted this Action on a wholly-contingent basis for nearly four years and advanced or incurred significant litigation

expenses.  Lead Counsel has long borne the risk of an unfavorable result.  We have not received any compensation for our substantial effort, nor have we been paid for our expenses.

18.     The fee application for 30% of the Settlement Fund is fair both to the Settlement Class and Lead Counsel, has been approved by Lead Plaintiffs, and warrants this Court's approval. This fee request is within the range of fees frequently awarded in these types of actions and is justified in light of the substantial benefits conferred on the Settlement Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.

19.     Lead Counsel also request an award of expenses in the amount of $447,111.03, which were reasonably and necessarily incurred in prosecuting the Action.  As set forth in more detail in my accompanying declaration in support of the fee and expense award, this amount includes the fees and expenses for: (a) investigators, consultants, and experts whose services Lead Counsel required in the successful prosecution, analysis, and resolution of this case; (b) stenographic and videographer services for nine days of fact and expert witness depositions; (c) travel and lodging for Lead Counsel to attend depositions and Court hearings; (d) conducting factual and legal research; (e) photocopying, imaging, and printing thousands of pages of documents; (f) litigation database costs for hosting, cataloging, and facilitating the review and analysis of more than 1 million pages of documents; and (g) participating in the private mediation that, collectively with the parties' other discussions, led to the proposed Settlement of this Action.

20.     Lead Plaintiffs should also be awarded compensation for the time they spent pursuing recovery for the Settlement Class in the Action.  As detailed in their accompanying declarations, filed contemporaneously herewith, Lead Plaintiffs actively monitored and participated in the prosecution of this lawsuit, including by reviewing briefs and discussing the merits of the case, producing documents in discovery to obtain certification of the class, and actively participating in discussions leading to the proposed Settlement.  The requested awards by Lead Plaintiffs CRERS

- 9 -

and WCERS of $1,200 and $9,350, respectively, are reasonable and were necessary to the successful prosecution of the Action.

21.     Each of the requested expenses was reasonably and necessarily incurred to plead Plaintiffs' claims with particularity, certify the class, conduct discovery, file and respond to pretrial motions, prepare this case for trial, and obtain a settlement on the terms proposed.

## II.     PROCEDURAL HISTORY

22.     Lead Plaintiffs' Counsel undertook significant efforts on behalf of the Settlement Class, expending more than 10,000 hours of time during the course of this Action.  The time expended was both reasonable and necessary in light of the complexity of this Action, the number and nature of the factual and legal disputes between the parties, the amount in controversy, and the zealous defense mounted by the skilled advocates retained by Defendants.

23.     Significant time was expended in developing and pleading the claims on behalf of the Settlement Class and in defeating Defendants' motion to dismiss.  After the Complaint was upheld, in part, significant additional time was required to oppose Defendants' motion for reconsideration, as well as to identify, locate, obtain, and review documentary evidence bearing on Lead Plaintiffs' claims, to move to compel additional production from Defendants, and to analyze the grounds for and prepare a motion to amend the Complaint to reinstate claims that had been dismissed on the pleadings.  The amount of time needed to prosecute this Action continued to increase once depositions commenced, as extensive efforts were undertaken to identify witnesses for deposition, analyze and select exhibits to be used to elicit testimony, and prepare for and conduct depositions of fact witnesses in Texas, Florida and Colorado.

24.     Concurrent with fact discovery, significant effort was undertaken to seek certification of the class, including to work with Plaintiffs' expert to review case information and finalize their report, and to analyze the report of Defendants' expert and prepare for and take her deposition.

- 10 -

25.     To provide the Court with a fuller understanding of the extent of and need for this effort, set forth below is a detailed description of each of the significant stages of the case and a summary of the work that was needed to assure that the claims of the Settlement Class were developed in a manner sufficient for them to survive to the next stage and, ultimately, for trial.

**A.     Pleading and Motion to Dismiss**

26.     This Action was commenced on October 28, 2014. ECF No. 1. On January 30, 2015, this Court appointed Wayne County Employees' Retirement System ("WCERS") and City of Roseville Employees' Retirement System ("CRERS") as Lead Plaintiffs and approved their selection of Robbins Geller Rudman & Dowd LLP as Lead Counsel and McDowell Hetherington LLP (f/k/a Edison, McDowell & Hetherington LLP) as Liaison Counsel. ECF No. 26.

27.     In order to meet the stringent pleading requirements of the PSLRA, 15 U.S.C. §78u-4, Lead Counsel at the outset of this Action conducted an analysis of publicly available information about Willbros and its industry, including information contained in the Company's press releases and filings with the Securities and Exchange Commission, in transcripts of Willbros' quarterly conference calls and investor presentations, and in numerous analyst reports, media articles, and other publications about the Company, its business, and the industry in which it operates.

28.     Forensic accountants employed by Lead Counsel analyzed the Company's financial statements and researched the applicable accounting standards that applied to its business to help Lead Counsel develop detailed allegations regarding Willbros' alleged violations of Generally Accepted Accounting Principles ("GAAP") and the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") Standards for internal controls.

29.     Lead Counsel retained L.R. Hodges & Associates, Ltd. ("LRH&A") to help locate, contact, and interview former Willbros' employees about the facts, transactions and occurrences giving rise to the Action. Lead Counsel worked closely with LRH&A to identify investigative

targets, focus investigative efforts on core factual issues and disputes in the case, review investigative summaries, identify areas in need of further investigation, evaluate factual information, and formulate allegations for pleading. LRH&A contacted numerous witnesses in the course of its investigation, and were able to conduct detailed interviews with approximately 20 witnesses about their employment at Willbros, including the nine confidential witnesses described in the Complaint as CW-1 through CW-9, and the former President of Willbros' Oil & Gas segment, Steven "Mike" Futch (who was specifically identified by name in the Complaint). The information obtained from these interviews assisted Lead Counsel in understanding the issues that give rise to this Action and in drafting a complaint in conformance with the pleading standards established by the PSLRA. *See* Complaint, ¶¶4, 45, 80-109, 111, 120-127, 139-156, 188-191; ECF No. 66 at 3.

30.     Based on the foregoing analysis of information, on March 31, 2015, Lead Plaintiffs filed a consolidated complaint alleging detailed factual circumstances giving rise to claims under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) arising from the misrepresentations concerning the performance of the Seaway and Sunoco projects, the adequacy of Willbros' liquidity, and the sufficiency of its internal controls over project management and liquidity forecasts. ECF No. 38.

31.     Following the filing of that complaint, Mr. Futch contacted LRH&A to object to how the information he had provided had been used. Although Mr. Futch generally reaffirmed the accuracy of the information previously provided to investigators and included in the complaint, he claimed – contrary to what he had said before – that he did not know specifically when the decision to restate Willbros' 2Q14 financial results had been made. Lead Counsel therefore immediately provided copies of Mr. Futch's e-mail communications to the Court and to Defendants and, on June 15, 2015, filed the SAC to reflect the new information provided by Futch. ECF No. 43.

32.     The SAC was the operative complaint at the time of settlement.  Appended to the Complaint was a detailed chart summarizing by date and category 30 separate misrepresentations and omissions that were alleged to give rise to liability under the federal securities laws.  *See* Exhibit 2 to ECF No. 43.

33.     On July 27, 2015, Defendants moved to dismiss the Complaint.  ECF No. 44. Defendants argued, among other things, that Plaintiffs failed to plead scienter or falsity in the manner required by the PSLRA.  Defendants asserted that Plaintiffs had failed to plead motive and that Defendants took immediate action to remedy problems, which they asserted undermined an inference of scienter.  Defendants also contended that most of the statements Plaintiffs claimed were misleading were either inactionable puffery or forward-looking statements protected under the PSLRA's statutory safe harbor.

34.     After analysis of Defendants' 65-page brief and the 63 cases and 34 documents cited therein, and after conducting substantial additional legal research and analysis, Lead Counsel filed a brief in opposition to the motion on August 26, 2015.  ECF No. 45.  Plaintiffs' 85-page opposition brief cited 86 cases and presented legal argument and factual analysis on numerous issues relating to the elements of falsity, materiality, and scienter.  The  brief explained in detail why Plaintiffs believed that the Complaint had adequately identified the statements alleged to be false and misleading, explained Plaintiffs' theory of liability, and contained detailed factual analysis of the problems on the Sunoco and Seaway projects and the Company's internal control and liquidity problems.

35.     On September 25, 2015, Defendants filed a reply in support of their motion to dismiss, raising several issues that had not been previously briefed.  ECF No. 46.  Lead Counsel therefore conducted additional factual and legal analysis of these new issues.

36.     On May 24, 2016, Plaintiffs presented oral argument on the motion to dismiss at a two-hour hearing before the Court.  At the conclusion of the hearing, the Court ruled from the bench, granting in part and denying in part Defendants' motion to dismiss, and permitting discovery to commence on seven of the alleged misrepresentations and omissions identified in the chart attached to the Complaint.  *See* May 24, 2016 Hearing Transcript, at 84:24-85:4.

37.     On June 14, 2016, Defendants filed a motion for reconsideration of the order on the motion to dismiss, requesting dismissal of all of the claims that had been upheld by the Court.  ECF No. 58.  Though Defendants' motion largely reasserted arguments made in their motion to dismiss briefing, generally presented under a claim that the Court had committed a manifest error in applying the law to the facts of the case, their motion also relied on certain arguments and cases that they had not presented in briefing on their motion to dismiss.  In particular, Defendants presented new authority in support of their argument that the reasons for an executive's departure are necessarily immaterial, arguing that Defendant Harl's termination, whether for cause or as part of an orderly retirement, could not give rise to liability.

38.     On July 15, 2016, Plaintiffs filed a detailed response in opposition to Defendants' motion.  ECF No. 61.  Plaintiffs demonstrated in the opposition that there was no manifest error or new law or facts to warrant reconsideration of the Court's order upholding in part Plaintiffs' claims. In particular, Plaintiffs demonstrated that the Court had properly analyzed Defendants' statements about Harl's departure, which were misleading because they concealed from investors weaknesses in the business, and not just because they falsely described the reasons for Harl's departure, as Defendants framed the inquiry.

39.     On July 22, 2016, Defendants filed an answer to the Complaint in which they denied most of Plaintiffs' substantive allegations and asserted 17 affirmative defenses.  ECF No. 63.

- 14 -

40.     On August 1, 2016, Defendants filed their reply in support of their motion for reconsideration.  ECF No. 65.

41.     On September 15, 2016, the Court issued its order denying Defendants' motion for reconsideration.  ECF No. 66.

### B.     Rule 16 and 26 Conferences

42.     On September 26, 2016 and October 10, 2016, the parties conducted their Rule 26(f) conferences and prepared their joint proposed case management order pursuant to Rule 16(b).  On November 4, 2016, the parties filed their Joint Discovery/Case Management Plan with the Court, providing 11 months to complete fact discovery and requiring class certification briefing and discovery to be completed in the first 6 1/2 months of that period.  While the schedule was aggressive, Lead Counsel believed it was achievable based on Defendants' representations that most of the relevant documents had been gathered during the Company's internal investigations and could be quickly produced.  This turned out not to be the case, and numerous discovery disputes later arose, generating extensive correspondence between counsel, requiring an extension of the case management schedule and ultimately resulting in contentious motion practice, as described further below.

43.     In connection with the discovery planning conferences, Plaintiffs also worked with Defendants to enter into stipulations covering the format for producing Electronically Stored Information ("ESI") and entry of a protective order governing trade secrets and similar confidential documents.  ECF Nos. 69-70.  Prior to submitting these agreements to the Court, the parties engaged in extensive and time-consuming negotiations over the course of several months and exchanged multiple drafts concerning disputed issues.  The Court entered the Protective Order and approved the discovery/case management plan on November 7, 2016.  ECF Nos. 71-72.

- 15 -

44.     Despite the fact that the Protective Order was limited to information within the scope of Fed. R. Civ. P. 26(c) for "Confidential" designations, and to information that would result in "competitive injury" to "commercially adverse" entities if made public for "Highly Confidential" designations, Defendants designated nearly half of their first 19 productions Highly Confidential. This increased the time necessary for Plaintiffs to review discovery materials, and resulted in multiple rounds of detailed correspondence during the initial discovery period to permit the documents produced to be used effectively by counsel.  It was not until May 3, 2017 that Defendants agreed to remove the Highly Confidential designations from their production.  Nevertheless, disputes continued to arise over Defendants' extensive use of the remaining "Confidential" designation, causing discovery in this case to be significantly more complex, time consuming, and expensive, as substantial efforts were required to limit access to "Confidential" documents and, where needed, to redact or file such documents under seal.

45.     Rule 26 disclosures were exchanged in October of 2016.  Plaintiffs made their initial disclosures on October 21, 2016, and identified hundreds of individuals and entities likely to have discoverable information, including 187 former and current employees of Willbros.  Defendants made their initial disclosures on October 28, 2016, which identified only six individuals likely to have discoverable information.

### C.     Class Certification

46.     On October 26, 2016, Defendants served discovery requests and interrogatories to determine whether there was a basis for opposing Plaintiffs' motion to certify this Action as a class action under Fed. R. Civ. P. 23.

47.     Defendants' 22 document requests and 13 interrogatories sought from Lead Plaintiffs, among other things, documents and information related to Plaintiffs': (i) organizational structure; (ii)  agreements and communications with investment advisors; (iii) communications with Willbros,

- 16 -

its directors, officers, employees, and agents; (iv) trades in Willbros stock, including trading records and account statements; (v) investment decisions concerning trades in Willbros securities; (vi) other litigation in which Plaintiffs were or had been involved; (vii) agreements with Lead Plaintiffs' Counsel; (viii) allegations in the Complaint; (ix) communications with other plaintiffs; and (x) communications with confidential witnesses or other third parties.

48.     Substantial efforts were required by Lead Plaintiffs and Lead Counsel to respond to these requests.  On December 5, 2016, Lead Plaintiffs served their written responses and objections to Defendants' discovery requests, and on January 3, 2017, Lead Plaintiffs produced trading records, brokerage statements, account statements, investment management agreements, and information concerning other cases in which Lead Plaintiffs sought to serve as class representative in a class action alleging securities fraud.

49.     On March 3, 2017, Plaintiffs moved for an order certifying this Action as a class action, appointing Lead Plaintiffs as Class Representatives, appointing Robbins Geller as Lead Counsel, and appointing McDowell & Hetherington LLP as Liaison Counsel pursuant to Fed. R. Civ. P. 23.  ECF Nos. 73-74.  Lead Counsel retained the services of Bjorn I. Steinholt, CFA and Managing Director at Caliber Advisors, Inc., to provide a statistical analysis to demonstrate that Willbros' stock traded in an efficient market, a fact that was necessary to permit the Court to find that common issues predominate, as required by Fed. R. Civ. P. 23(b)(3).  ECF No. 73-4.  Mr. Steinholt's report demonstrated that each of the *Cammer* and *Krogman* factors support a determination that Wilbros' stock traded in an efficient market, including through a regression analysis showing that the stock price responded to new material information about the Company. Mr. Steinholt also explained how the Settlement Class' damages were susceptible to class-wide proof.

50.     The motion also provided detailed factual evidence demonstrating each of the factors required to show that class certification was proper under Rules 23(a) and 23(b)(3), including commonality, typicality, and superiority.

51.     On April 11, 2017, Defendants took the deposition of Michael Finkelstein, testifying on behalf of NorthPointe Capital, LLC, the outside investment manager to both of the Lead Plaintiffs.  On April 12, 2017, Defendants took the deposition of Sharon Maas, testifying on behalf of CRERS.  On April 13, 2017, Defendants took the deposition of Gerard Grysko, testifying on behalf of WCERS.  All three deponents appeared as representatives of their organizations pursuant to Fed. R. Civ. P. 30(b)(6).  All three depositions took place in or near Detroit, Michigan.

52.     Defendants responded to Plaintiffs' class certification motion on June 2, 2017.  ECF Nos. 79-80.  Defendants opposed Plaintiffs' motion primarily by contending that Defendants' actionable statements did not have price impact, which if true, could defeat the predominance requirement under Rule 23(b)(3).  Defendants also asserted that Lead Plaintiffs were not adequate class representatives under Rule 23(a)(4).  *Id.*

53.     Defendants' opposition was accompanied by the expert report of Lucy P. Allen.  ECF No. 79-2. Ms. Allen asserted that: (i) none of Defendants' alleged misleading statements caused an increase in Willbros' stock price, demonstrating a lack of price impact at the front end of the Settlement Class Period; (ii) the corrective disclosures made on October 21-22, 2014 and December 15, 2014 concerned Willbros' restatements and other business problems, but did not correct the alleged misrepresentations, such that Defendants' alleged fraud did not play a significant role in the decline of Willbros' stock price, demonstrating a lack of price impact at the back end of the Settlement Class Period; (iii) the increase in Willbros' stock price on December 15 and 16, 2014 also shows an absence of price impact, and suggests that the decline of the stock price after October 21, 2014 was an overreaction; and (iv) the expert report of Mr. Steinholt failed to explain how a

- 18 -

common methodology for assessing damages can be designed to account for the stock price increase on and around December 15, 2014.

54.     On June 28, 2017, Plaintiffs deposed Ms. Allen in New York City to understand the manner in which she had conducted her analysis, and to cross-examine her on the basis for her opinions.

55.     On July 28, 2017, Plaintiffs filed a 26-page reply brief containing detailed factual and legal analysis rebutting Defendants' objections to class certification and further supporting Plaintiffs' motion for class certification.  ECF Nos. 82, 85.  Plaintiffs' reply was also supported by the rebuttal report of Bjorn I. Steinholt.  ECF No. 85-7.

56.     On August 16, 2017, Defendants filed a sur-reply or supplemental response to Plaintiffs' motion for an order certifying this Action as a class action.  ECF No. 90.  On August 18, 2017, Plaintiffs filed a motion to strike Defendants' unauthorized sur-reply.  ECF No. 92.

57.     Plaintiffs' motion for class certification remained pending at the time of settlement.

**D.     Experts**

58.     Analyses by expert witnesses assisted Lead Counsel in refining Plaintiffs' claims for amendment, preparing for depositions and pursuing other discovery, seeking certification of the class, and preparing for summary judgment and a possible trial.  The work performed by these experts provided valuable insight to Lead Plaintiffs and Lead Counsel in preparing this case at each stage of litigation and in evaluating the prospects for settlement.

59.     Plaintiffs retained the following experts to assist with the litigation and in anticipation of trial: (1) Bjorn I. Steinholt, CFA, as an expert in financial and economic analysis, including analyzing and valuing investments; and (2) Greg Lamberson, as an expert in the field of business, project and construction management of upstream & midstream oil, gas, products, and energy-

related projects. Mr. Steinholt is an expert in the field of econometrics (market efficiency, damages and loss causation).

60. The efforts by Messrs. Steinholt and Lamberson were necessary to the successful prosecution of the Action, and the number of hours expended and amounts charged by the experts were reasonable in light of the nature of the work performed and the expertise each brought to the performance of his analysis.

61. **Greg Lamberson**: Mr. Lamberson was retained as a consulting expert to assist in reviewing and analyzing Defendants' production and assist in preparation for depositions and for a possible trial. Mr. Lamberson is an expert in the construction of oil and gas pipelines. Mr. Lamberson assisted Lead Counsel in identifying relevant categories of evidence in discovery and assisted in reviewing and analyzing that evidence after it was obtained. Mr. Lamberson has substantial experience in managing and consulting on major transnational and cross-country pipeline projects, and in analyzing and opining on issues of project forecasting, tracking, and revenue recognition, internal controls, and related management, project, and construction issues in the energy sector. He provided substantial assistance to Lead Counsel in understanding and evaluating the factual issues that was critical to the effective prosecution of this case. At the time of settlement, Mr. Lamberson had not been designated as a testifying expert in the Action.

62. **Bjorn I. Steinholt**: Mr. Steinholt was retained as an expert to assist in demonstrating market efficiency at the class certification stage, to consult regarding the regression analysis and event study, and to assist Lead Counsel in ascertaining the feasibility of developing a methodology for calculating damages on a class-wide basis. Mr. Steinholt expended substantial time analyzing the facts related to this case, producing an initial report, reviewing the reports of opposing experts and the documents on which they relied, responding to discovery requests, and producing a rebuttal report. Mr. Steinholt also expended substantial time and effort preparing for and being deposed.

- 20 -

Mr. Steinholt assisted Lead Counsel in analyzing issues of loss causation and damages, and in preparing event studies and analyses to assist in the evaluation of proposals to settle the Action. Mr. Steinholt has substantial experience in analyzing and opining on issues of reliance, loss causation, and damages in connection with claims brought under the federal securities laws. Mr. Steinholt and staff under his supervision spent hundreds of hours analyzing the movement of Willbros' stock price and reviewing both public and non-public information about Willbros and its competitors. Mr. Steinholt developed detailed opinions on market efficiency and the calculation of damages on a per-share basis. *See* ECF No. 73-4. Mr. Steinholt prepared and analyzed an event study in which he reviewed publicly available information concerning Willbros on every day of the Settlement Class Period to determine the extent to which the information had impacted the market price of Willbros common stock, while accounting for market and industry factors that may have also affected the stock price. Mr. Steinholt submitted a rebuttal report addressing the analysis contained in the report of Defendants' expert, Lucy P. Allen. ECF No. 85-7. Mr. Steinholt was deposed by Defendants on April 14, 2017, in connection with Plaintiffs' motion for class certification.

63.     On March 23, 2017, Defendants served a deposition notice and 21 broad document requests seeking information relating to Mr. Steinholt's report. The requests sought, *inter alia*, the documents reviewed by Mr. Steinholt, along with his notes and work files, in preparing his expert report on market efficiency. The parties met and conferred on March 23, 2017, concerning Plaintiffs' objections and responses to the requests for production, and thereafter by letter. On March 30, 2017, Plaintiffs produced more than 1,500 pages of documents from Mr. Steinholt in response to Defendants' requests. Lead Counsel and Mr. Steinholt and others under his direction expended significant time identifying and reviewing documents for responsiveness and privilege, and preparing responsive, non-privileged documents for production.

64. In attempting to challenge Plaintiffs' motion for class certification, Defendants identified Dr. Lucy P. Allen as an expert on damages and loss causation. Ms. Allen submitted an expert report in support of Defendants' opposition to Plaintiffs' motion for class certification. ECF No. 79-2. On June 9, 2017, Plaintiffs served a subpoena requesting production of documents by Ms. Allen. The subpoena sought reports and testimony from other actions, documents related to compensation and hours worked, and documents related to specific opinions made in her expert report and her underlying evidence. On June 28, 2017, Plaintiffs took the deposition of Ms. Allen. As a result of Plaintiffs' discovery efforts, Defendants ultimately produced more than 14,500 pages of expert document discovery which Lead Counsel reviewed and analyzed in preparation for Ms. Allen's deposition. Lead Counsel spent substantial time reviewing the documents produced and preparing for and taking Ms. Allen's deposition and preparing Mr. Steinholt to testify.

### E. Fact Discovery

65. Plaintiffs vigorously pursued fact discovery for over a year, from November 2016 through February 2018. During this time, Lead Counsel obtained and analyzed 32,855 documents, constituting more than 175,000 pages, from Defendants and more than 46,000 documents, constituting more than 890,000 pages, from 18 third parties. Lead Counsel also conducted eight fact witness depositions in three states.

66. Plaintiffs faced significant hurdles in obtaining relevant documents due to repeated disputes with Defendants regarding the proper scope of discovery, including disputes over: (i) the sufficiency of Defendants' search for and production of responsive documents, including disputes over the number and identity of custodians whose e-mails and other electronic files would be searched; (ii) the adequacy of the search terms used by Defendants to identify the categories of documents requested by Plaintiffs; (iii) Defendants' refusal to search the desk files or other paper records of those custodians; (iv) the relevant time period that would be searched for responsive

- 22 -

information; (v) the nature and identity of the electronic systems used by Willbros during the Settlement Class Period, and the nature and availability of evidence located in those systems; (vi) Defendants' efforts, if any, to preserve relevant evidence, and other circumstances suggesting that relevant evidence had been discarded and was no longer available for production; and (vii) the timing of Defendants' production of responsive information, and the deadlines for the completion of discovery.

67.     Defendants' discovery strategy caused Lead Counsel to expend significant time and resources writing and responding to correspondence regarding the above-described disputes, negotiating and documenting the need for extension of the pretrial schedule (ECF No. 96), and bringing a motion to compel the production of further documents and information concerning the nature of Defendants' preservation, collection, and production (ECF No. 103).   This made prosecution of the Action more difficult, and also at times required the participation of additional support staff and attorneys to assure that discovery was obtained, productions were reviewed and analyzed, depositions were effective, and disputes were timely raised with Defendants and, if necessary, the Court.  As of the time the parties agreed in principle to settle, the Court had not ruled on Plaintiffs' motion to compel, creating uncertainty as to what discovery Plaintiffs could obtain before the close of discovery.

68.     After obtaining relevant discovery, Lead Counsel spent hundreds of hours reviewing, organizing, and analyzing the production in the time permitted to effectively prepare for depositions and in anticipation of summary judgment, expert reports, and trial.  Given the nature of the claims at issue in the Action, much of the important information was buried in spreadsheets, power point presentations, internal reports, and e-mails.  Technical issues with the production, and numerous versions of some spreadsheets and reports, made the task of locating and analyzing key evidence more difficult.  Significant time was required just to search through tens of thousands of documents,

1445226_1

including many duplicates, to locate evidence for use at depositions or trial, and substantial additional time was spent analyzing that information once it was found.

69.     Lead Counsel's forensic accountants, investigators from LRH&A, and pipeline construction expert Lamberson also assisted Plaintiffs in conducting factual discovery and preparing for trial.  Forensic accountants conducted extensive analysis of the financial information produced by Willbros and worked closely with outside experts to help Lead Counsel understand and address the accounting issues in the case.  LRH&A also worked closely with Lead Counsel to contact potential deponents and trial witnesses to obtain information that assisted Plaintiffs in discovery and trial preparation.

### 1.     Document Production and Written Discovery

70.     On October 14, 2016, Plaintiffs served their First Set of Requests for Production of Documents to Defendants ("Plaintiffs' First RFPs"), comprising 46 requests seeking narrowly-defined and relevant categories of information necessary for Plaintiffs to meet their burden to demonstrate each of the required elements of their claims.

71.     Thereafter, the parties had numerous discussions and exchanged dozens of letters regarding the scope of the discovery, the manner in which evidence would be located and produced, and the required time for doing so.  These disputes required hundreds of hours of time to be expended by numerous attorneys, paralegals, and other members of Lead Counsel's litigation team to attempt to determine what had been produced and what was missing from the production, and to raise issues with Defendants.  Although Defendants did make rolling productions – ultimately producing 32,855 documents, constituting more than 175,000 pages, spread across 34 productions made between October 28, 2016 and February 2, 2018 – numerous categories of evidence sought by Plaintiffs were not produced, resulting in the expenditure of hundreds of hours of additional time in investigating and raising those disputes with Defendants, and ultimately with the Court.  In addition

to increasing the time and cost of litigation, these disputes substantially delayed Plaintiffs' ability to review documents, identify necessary custodians and search terms, or to identify and prepare the depositions of fact witnesses.

72.     As discovery continued, Plaintiffs continued to identify numerous gaps in Defendants' production, as well as technical deficiencies that impeded, and in some cases prevented, Plaintiffs from effectively reviewing, analyzing, and categorizing the documents Defendants had produced.  Defendants' refusal to produce the documents as kept in the ordinary course of business or to organize their production according to the categories in the requests further impeded, and increased the time and expense of, Plaintiffs' document review.  While the parties were able to resolve some of these disputes, many others remained outstanding at the time of the proposed settlement.

## 2.      Depositions

73.     During the course of discovery, Plaintiffs deposed eight fact witnesses in three states. At the time the parties agreed in principle to settle this litigation, the parties had scheduled, and Lead Counsel had commenced preparations to take, dozens more depositions.  To prepare for and efficiently conduct these depositions, Lead Counsel spent significant time searching for, reviewing, analyzing, and categorizing pertinent documents and preparing outlines for the examinations.

74.     The table below sets forth the depositions taken by Lead Counsel:

| DEPONENT | POSITION | DATE | LOCATION |
|---|---|---|---|
| Dennis Berryhill | Corporate Director of Human Resources | November 8, 2017 | Houston, TX |
| Billy Lambeth | Construction Manager | November 19, 2017 | Plantation, FL |
| Steven M. "Michael" Futch | President, Oil & Gas | December 1, 2017 | Houston, TX |
| Daniel Hilderhoff | Manager of Finance and Administration - NE Region | December 12, 2017 | Houston, TX |

| DEPONENT | POSITION | DATE | LOCATION |
|---|---|---|---|
| Benjamin Placzek | Project Engineer - Lineal Industries | January 12, 2018 | Aurora, CO |
| Jennifer Otto | Manager, Financial Reporting & Risk | January 19, 2018 | Houston, TX |
| Stephen Douglas | SVP, Strategy and Corporate Development | January 26, 2018 | Houston, TX |
| Steven Wilberts | Director, Internal Audit | February 15, 2018 | Houston, TX |

### 3.    Document Discovery from Third Parties

75.    During the course of the Action, Plaintiffs issued subpoenas to 18 non-parties, including Willbros' outside auditor, Wall Street analysts, Willbros' customers for the Seaway and Sunoco projects, and outside consultants who reviewed the Seaway and Sunoco projects. Lead Counsel expended significant resources in drafting and serving these subpoenas and conferring with subpoenaed entities, several of whom were resistant to document production. Nevertheless, as a result of Lead Counsel's efforts, Plaintiffs obtained over 46,000 documents, constituting more than 890,000 pages, which were analyzed for use in discovery and motion practice and which filled gaps in Defendants' production.

76.    Plaintiffs served a third-party subpoena on Willbros' auditor, PricewaterhouseCoopers LLP ("PWC") in May 2017, seeking documents relating to PWC's audit of Willbros and Willbros' revenue recognition, internal controls, and debt controls. Lead Counsel and its forensic accountants met and conferred extensively with PWC on numerous occasions, memorializing disputes and agreements in detailed letters. Though the meet and confer process, and PWC's production, was ongoing at the time the parties agreed to settle, Plaintiffs were able to obtain not only relevant documents created by PWC, but also notes from internal Willbros reviews that Defendants had not produced to Plaintiffs. This production enabled Plaintiffs to develop substantial evidence, in particular evidence supporting Plaintiffs' allegations that senior Willbros management knew about the problems with the Seaway and Sunoco projects. The production also alerted

- 26 -

Plaintiffs to numerous relevant categories of documents that Defendants had not produced, resulting in additional meet and confer efforts with Defendants.

77.     Plaintiffs also engaged in extensive meet and confers over production disputes regarding subpoenas served on Warner Construction Consultants, Inc. and RNG Group, Inc., entities that were involved in the internal investigations into the problems on the Seaway and Sunoco projects.  In addition to objections to production asserted by the third parties, Plaintiffs spent extensive time addressing additional objections raised by Defendants regarding the scope of the subpoenas and Willbros' attempt to assert claims of privilege over the documents.  Due to Plaintiffs' persistence, Warner and RNG Group ultimately produced, in combination, 470 important documents constituting over 4,900 pages concerning Warner's review of the two projects.  This production enabled Plaintiffs to develop substantial evidence supporting Plaintiffs' allegations.

78.     Plaintiffs served third-party subpoenas for the production of documents upon nine securities analysts who covered Willbros during the Settlement Class Period, seeking documents relating to the analysts' review and analysis of the Company's financial results and public statements, and their communications with management and with investors.  Plaintiffs met and conferred with counsel from these entities on numerous occasions.  As a result of these efforts, Plaintiffs eventually obtained 44,993 documents from Willbros analysts, constituting over 884,000 pages of documents.  Lead Counsel spent considerable time reviewing and analyzing these documents, uncovering important evidence corroborating Plaintiffs' theories of liability and damages, and providing additional evidentiary support for the opinions of Plaintiffs' experts.

79.     Plaintiffs also dedicated considerable resources to identifying the customers, outside counsel, public relations, and executive search entities that had relevant information, obtaining documents from those entities, and analyzing the documents that were produced for use in discovery, expert reports, and at trial.  Plaintiffs issued subpoenas to: (i) three pipeline construction/energy

industry customers (Sunoco Logistics Partners L.P., Enterprise Products Partners L.P., and Enbridge Inc.); (ii) the executive search firm that worked to find Harl's replacement (Russell Reynolds Associates, Inc.); (iii) Willbros' outside investor relations consultant (Dennard Lascar Associates, LLC); and (iv) Harl's lawyer (David L. Hankey).  Lead Counsel dedicated considerable time and attention to negotiating the responses to these subpoenas over the ensuing months.  Because of the subpoenas Plaintiffs served and the time dedicated to subsequent negotiations in meet-and-confers, Plaintiffs received from these third parties over 500 documents, constituting over 2,000 pages of relevant information.

### 4.      Production Disputes Leading to Motions to Compel

80.      During fact discovery, Defendants vigorously sought to restrict the scope of their production by limiting their search for responsive documents to search term- and custodian-based searches of electronic documents, and by limiting the requests they would respond to and the number and types of search term and custodians they would use.  Plaintiffs also faced obstacles from Defendants' refusal to provide basic, easily accessible information concerning the documents Defendants collected and the manner in which those documents were reviewed for production.  Plaintiffs dedicated significant time and energy to attempting to resolve these disputes before seeking judicial intervention.[3]

81.      Plaintiffs engaged in extensive negotiations with Defendants to expand the search terms and custodians used for electronic discovery, to produce specific documents and document sets without relying exclusively on search terms and custodians to search ESI, and to obtain basic information concerning what Defendants did to meet their duty of production or why gaps in Defendants' production persisted.  Plaintiffs pressed for and eventually obtained increases in the

---

[3]   For a brief period Defendants pursued documents and communications related to confidential witnesses, but soon dropped those requests following Lead Plaintiffs' detailed explanations in four letters and one meet and confer that such materials were privileged.

numbers of custodians and search terms.  Plaintiffs also were able to identify and convince Defendants to produce certain specific types of documents that had previously been withheld from production.  Nevertheless, significant gaps remained in Defendants' production at the time of settlement.  *See* ECF Nos. 103-106.

82.     On October 3, 2017, after dozens of letters had been exchanged on these issues and months of meet-and-confers had taken place, Plaintiffs filed a detailed motion to compel Defendants to provide information regarding the electronic systems used by Willbros and the other locations where responsive documents might be located, to describe the manner in which these sources of evidence had been searched, to compel the production of documents responsive to 14 specific requests that had been propounded by Plaintiffs, and to require Defendants to search the files of additional custodians and to cooperate with Plaintiffs in drafting new search terms.  ECF No. 103.

83.     Defendants vigorously opposed Plaintiffs' motion to compel.  Defendants formally opposed the motion in their opposition filed on November 6, 2017 (ECF Nos. 108-111).  After Plaintiffs submitted a detailed reply in support of their motion (ECF No. 114), Defendants filed a sur-reply on December 13, 2017 (ECF No. 115), which Plaintiffs moved to strike (ECF No. 116).

84.     The motion to compel remained pending at the time the proposed Settlement was reached.

### F.     Motion for Reconsideration and Leave to Amend

85.     On June 30, 2017, Plaintiffs filed a motion for reconsideration of the Court's May 24, 2016 order dismissing in part Plaintiffs' claims and requesting leave to amend.  ECF No. 80. Plaintiffs' motion, supported by significant evidence newly-obtained through discovery, sought to replead two sets of claims that were previously dismissed by the Court: (i) claims arising from alleged misrepresentations about Willbros' liquidity; and (ii) claims arising from alleged

misrepresentations about the Company's 1Q14 financial results and the performance of the Seaway cross-country pipeline project.

86.     On August 1, 2017, Defendants filed their opposition to Plaintiffs' motion.  ECF No. 87.

87.     On August 22, 2017, Plaintiffs filed a detailed reply in support of the motion.  ECF No. 94.  Plaintiffs' reply responded to each of Defendants' opposition arguments, demonstrating the PSLRA did not prohibit amendment and that the evidence produced in discovery was sufficient to establish a strong inference of scienter and plead detailed allegations of falsity with respect to the previously dismissed claims.

88.     On September 15, 2017, Plaintiffs proffered a Third Amended Complaint, which included the new evidence described in the motion for reconsideration and leave to amend and reply in support of that motion.  ECF No. 99.

89.     On September 19, 2017, the parties appeared before the Court for a case management hearing, during which each side briefly outlined its principal arguments on the pending motions to compel and for leave to amend.  At the conclusion of the hearing, the Court amended the scheduling order to extend the fact discovery cutoff to March 30, 2018, while telling the parties that any further requests to extend the discovery period were unlikely to be granted.

90.     On February 9, 2018, the Court scheduled oral argument to take place on March 14, 2018 on the motions to compel and for leave to amend.  This created significant difficulties and uncertainties with respect to the remainder of the discovery schedule, as it raised questions over the proper scope of examinations for key witnesses to be examined during this period, and would require counsel to prepare for and argue these motions during the same weeks when key depositions of significant witnesses were scheduled to take place.  While these risks and uncertainties were not insurmountable, they did play a role in reviving settlement discussions between the parties.

## III.   NATURE AND ADEQUACY OF THE SETTLEMENT

91.   The proposed Settlement was the product of vigorous, arm's-length negotiation between the parties that reflects the strengths and weakness of the case.  Settlement on the terms proposed would not have been achieved absent the extensive efforts described above to plead and obtain the evidence necessary to prove Plaintiffs' claims of securities fraud.  Nor would settlement have been achieved without the substantial participation and assistance of a strong mediator with extensive experience in negotiating resolution of complex actions of this type.

92.   We believe that our reputation as attorneys who will zealously prosecute a meritorious case through the trial and appellate levels, as well as our aggressive litigation of this case, put us in a strong position in settlement negotiations with Defendants and their insurance carriers.

93.   Set forth below is a brief description of the history of settlement discussions in this case, an assessment of the strengths and weaknesses of the case and the risks to recovery at trial, and a description of the significant terms of the Settlement.

### A.   History of Settlement Negotiations

94.   Throughout the course of this Action, Defendants strenuously denied liability. Meaningful settlement discussions did not commence until discovery had proceeded for more than a year.

95.   On September 5, 2017, Lead Plaintiffs made a settlement demand on Defendants and invited them to engage in mediation to determine whether a settlement on terms that were fair, reasonable and adequate to the Settlement Class was possible in light of the progress of the case to date and the risks of further litigation.  Defendants rejected the demand, but agreed to participate in further settlement discussions with the assistance of an outside mediator.

96.     On September 19, 2017, the Court entered an order granting the parties' stipulated motion to modify the schedule (ECF No. 101), but did not indicate when it might rule on Plaintiffs' outstanding motions for class certification or for reconsideration and leave to amend.  Influenced in part by the uncertainty remaining in the timing and outcome of these motions, and of Plaintiffs' anticipated motion to compel discovery, both parties began to identify possible mediators eventually agreeing on Mr. Meyer and setting the groundwork for settlement discussions to commence.

97.     Prior to the formal mediation session, Lead Counsel prepared a detailed letter with exhibits for Mr. Meyer explaining the factual background of the case, describing the extensive evidence to support Plaintiffs' claims that had been developed in discovery, explaining how Plaintiffs intended to respond to Defendants' defenses at summary judgment or trial, and candidly assessing the strengths and weaknesses of the case.  Defendants prepared a similar submission, and the mediation statements were exchanged by the parties so the points raised therein could be considered by the parties prior to the mediation session.  Discovery continued as the parties prepared to mediate, including the deposition of Mike Futch, which took place on December 1, 2017 in Houston.

98.     On December 5, 2017, a formal mediation took place at Mr. Meyer's office in Los Angeles, during which the parties vigorously advocated their positions and were pressed to confront the potential weaknesses in their positions and the strengths of the other side.  Although the mediation was not successful in resolving the Action, it set the groundwork for discussions to continue.  Thereafter, informal settlement discussions continued to take place through the mediator as warranted by additional developments in the case.  As a result of the parties' continuing discussions, the continued pursuit of discovery by Plaintiffs, and the substantial efforts of Mr. Meyer in engaging with representatives on both sides of the case, the parties reached an agreement in principle on the dollar amount and material terms of the Settlement on February 20, 2018.  After

- 32 -

advising the Court that an agreement in principle had been reached, the parties negotiated and signed a formal settlement agreement.   Plaintiffs filed their motion for preliminary approval of the Settlement on April 13, 2018.  ECF No. 123.

### B.   Strengths and Weaknesses of the Case

99.   Based on four years of litigation, including extensive fact and expert discovery and motion practice and detailed analyses of the factual and legal issues underlying the Action, Lead Counsel and Lead Plaintiffs have a thorough understanding of the issues and risks present in this case.  While Lead Counsel and Lead Plaintiffs believe that substantial evidence existed to support a jury verdict in favor of the Settlement Class, they also recognize the considerable risks and uncertainties if the case were to proceed to trial. These risks were carefully considered at every step of the litigation, including the decision to settle.

100.   We believe that Plaintiffs had developed strong proof of both liability and damages to present to the jury at trial, and that such evidence, if credited by the jury, was more than sufficient to sustain a verdict in favor of the Settlement Class.   During discovery, for example, Plaintiffs developed strong evidence to support allegations that members of Willbros Executive Leadership Team ("ELT"), including the top management in its Oil & Gas segment, had known about the performance problems on the Sunoco project before the Company issued its 2Q14 earnings and told investors that the problems in that segment did not extend beyond the Seaway project, which had caused that quarter's earnings to suffer.

101.   While we believed the evidence was sufficient to support a verdict that the named defendants recklessly disregarded the Sunoco problems, Defendants had credible arguments that knowledge of the issues on that project were confined to the Oil & Gas segment and unknown by the named Individual Defendants before 2Q14 earnings were announced.   While we believe the evidence demonstrated scienter of executives (including at least one ELT member) that was

imputable to Willbros, Defendants vigorously disputed that the Company could be held liable in the absence of proof of liability of at least one of the named Individual Defendants. While we do not believe that Defendants were correct in their analysis, at the time of settlement we had not yet developed direct documentary evidence of an Individual Defendant's knowledge of the full extent of the Sunoco problems prior to the 2Q14 earnings call. Similarly, while we believed that the evidence would show that the Sunoco problems were known to Defendants at the time Mr. Harl's departure was announced, substantial discovery disputes remained over the production of documents relating to the termination of his employment. As a result, based on the available evidence at the time of settlement, there was no certainty as to whether the jury would find that Harl's retirement was voluntary or that he was terminated for cause.

102.   By the time of settlement we believed Plaintiffs had also developed powerful evidence that ELT members, including the named defendants, had known about and recklessly failed to disclose the Company's inability to accurately or reliably forecast its liquidity needs throughout 2014. In addition, we believed Plaintiffs had developed strong evidence that senior Oil & Gas segment officers had deliberately manipulated the 1Q14 Seaway results to avoid reporting a quarterly loss on the project and for the segment as a whole.

103.   Despite the strength of the evidence demonstrating the manipulation of the Seaway results and the knowledge of the liquidity forecasting weaknesses, those allegations had been dismissed on the pleadings. Although Plaintiffs had moved to reinstate the Seaway and liquidity claims through an amended pleading, that motion had yet to be ruled on at the time of settlement. This created significant uncertainty as to the viability of those claims, as well as the amount of damages potentially recoverable in this Action. In particular, expert analyses prepared for the Plaintiffs concluded that the Sunoco claims that had been upheld at the time of settlement would have permitted Plaintiffs to recover a maximum of approximately $25 million in damages, not

- 34 -

including pre-judgment interest.  On the other hand, if the claims arising from the Seaway and liquidity claims were reinstated and proven, the expert estimated that the recoverable damages in the Action could have exceeded $100 million plus pre-judgment interest.

104.     Regardless of the outcome of the motion to amend, Plaintiffs faced significant risks regarding the requirements for and sufficiency of proof of loss causation and damages.  At the time of the proposed Settlement, the parties had significant disagreement over numerous factual and legal issues pertaining to these matters, including: (i) the requirements for establishing "corrective disclosure" and "price impact" of the fraud; (ii) the requirements for identifying, quantifying, and "disaggregating" the impact of non-fraud related factors; and (iii) the proper methodology for calculating damages.

105.     For example, Plaintiffs' ability to prove damages resulting from the Sunoco misrepresentations was complicated by the fact that the Court had dismissed claims arising from the restatement of 2Q14 financial results.  While we believe that the law permits recovery of the entire price decline caused by the revelation of the difficulties the Company had faced on that project and the resultant financial problems caused by those problems, we expected Defendants to raise strenuous objections that damages had to be reduced by the portion of the drop resulting solely from the portion of the announcement revealing that the Company's 2Q14 earnings would be restated.

106.     These damage-related issues also threatened to impact Plaintiffs' ability to certify the proposed class, as Defendants had vigorously attempted to argue that there was no "price impact" from the alleged misrepresentations regarding the performance of the Allegheny Access project. Defendants also argued that, in light of an increase in Willbros' stock price on December 15, 2014, Plaintiffs would not be able to design a common methodology to determine damages for the class. While Plaintiffs were confident that they could defeat these arguments, there was no assurance of success and failure would have defeated class certification.

- 35 -

107.     In addition, the uncertainty regarding the claims that were the subject of the motion to amend had complicated discovery at the time of settlement, and would have significantly affected both the amount of discovery that was required and the time needed to complete it.  At the time of settlement, for example, depositions of the Individual Defendants and other important fact witnesses were about to take place, yet Plaintiffs were uncertain whether the liquidity and Seaway claims would be reinstated, and lacked the complete production that was necessary to effectively cross-examine these witnesses on those claims.  This created significant risks on both sides, risks that were heightened by the impending fact discovery cutoff and the clear direction from the Court that further extensions of the trial date were unlikely to be permitted.

108.     Whether or not the Seaway and liquidity claims were reinstated, Plaintiffs would face significant risks in developing evidence regarding aspects of their core theory of the case.  Numerous unresolved discovery disputes had arisen at the time of settlement, including disputes over the limited production of e-mails concerning some of the key events in the case.  It was uncertain whether the lack of e-mails from the files of the named Individual Defendants reflected the lack of evidence to support the claims, as Defendants suggested, or whether it instead reflected a failure to properly preserve or to conduct a reasonable search for relevant evidence, as Plaintiffs maintained.  Significant uncertainty existed as to the resolution of these issues, both because Plaintiffs' motion to compel remained pending at the time of settlement, and because additional disputes that could have led to further discovery motions were still being negotiated at the time of settlement.  If these disputes were not resolved in Plaintiffs' favor, that would have seriously impacted Plaintiffs' ability to present a compelling case of fraud to the jury.

109.     In sum, while Lead Plaintiffs were confident they could present a strong case to the jury based on the documentary and testimonial evidence they had developed during the course of discovery, they faced significant factual, legal, and practical challenges in presenting this matter to a

jury.  These risks were considered carefully by Lead Counsel and Lead Plaintiffs in determining the merits of and evaluating the fairness and reasonableness of the mediator's proposal and seeking approval of the Settlement.

### C.     Reasons for Settlement

110.     Plaintiffs believe they could have prevailed on the merits of the case.  Defendants were just as adamant that Plaintiffs would fail.  There was a very real risk, as discussed above, that Plaintiffs would not prevail at trial.  Had Plaintiffs' case successfully reached trial, Plaintiffs faced the risk that the Court would find Defendants' statements inactionable or a jury would not be convinced that Defendants' statements were false or misleading or that Defendants acted with the requisite scienter.

111.     In addition, there were also significant risks to the amount of damages potentially recoverable in this Action.  The $25 million in estimated damages in this case as presently postured were derived entirely from the 36% decline in WG's share price on October 22, 2014 following the announcement of the Allegheny Access performance problems and resulting restatement of the 2Q14 financial results.  Based on this price decline, Plaintiffs estimated, with the assistance of their experts, that a maximum of $25 million in damages (before pre-judgment interest) would be recovered by the Settlement Class. However, this assumed that Plaintiffs would be successful in proving that the drop was entirely caused by conditions concealed by fraud, that the fraud was proved for the entire Settlement Class Period, that certain assumptions regarding the size of the Settlement Class and the number of shares damaged by the fraud were accurate, and that all eligible claimants had and would submit the evidence needed to prove their eligibility for a damage award. Significant reductions in the amount of damages recoverable could have occurred if any of these assumptions proved erroneous.

112.     Plaintiffs faced additional risks to damages in that the class period associated with the upheld claims commenced with a price decline (on negative quarterly results caused by the poor performance of the Seaway project) and ended with a price increase (on news that the restatement had been completed and the Company's problems were purportedly behind it).  While these issues did not affect the amount of damages, they did give rise to arguments that Defendants would try to use to convince the jury that the stock price movement during the proposed class period corresponding to the upheld claims was inconsistent with Plaintiffs' fraud-based theory of the case.  While these risks would have disappeared had the motion to amend been granted, Plaintiffs would still have faced risks in proving damages based on the additional stock price declines relevant to the Seaway and liquidity claims.  Plaintiffs would have faced the same risks to establishing damages as are present with respect to the October 22, 2014 price decline, including to their ability to prove that each of the relevant drops was "corrective" and that the entirety of each drop was recoverable as damages.  Lack of success on any of these arguments could have significantly reduced Plaintiffs' damages from the estimated $100 million they could potentially recover assuming the motion to amend was granted in its entirety.

113.     Having considered the foregoing, and evaluating Defendants' likely defenses at trial, it was the informed judgment of Lead Plaintiffs and Lead Counsel, based upon all proceedings to date and their extensive experience in litigating shareholder class actions, that the proposed Settlement of this matter before the Court upon the payment of $10 million in exchange for a mutual release of all claims, and on the other terms set forth in the Stipulation provides fair, reasonable, and adequate consideration, and is in the best interests of the Settlement Class.

D.      **The Proposed Plan of Allocation**[4]

114.    The proposed Plan of Allocation was based upon the event study and damages analyses prepared by Plaintiffs' expert for this Action, taking into account the movement of Willbros' stock price during the Settlement Class Period and Lead Counsel's evaluation of the relative strengths and weaknesses of the claims made in the Action.  The Plan of Allocation is intended to fairly apportion the net proceeds of the Settlement based on the stock price inflation at the time of purchase, measured by the relevant portion of the subsequent stock price declines caused by the five corrective events identified by Plaintiffs' damages expert, and taking into account the risks of continued litigation.  The Plan of Allocation was developed without reference to any particular trading patterns of any of the Lead Plaintiffs.

115.    The amount of inflation in Willbros' stock after each of the identified corrective events was determined based on an event study analysis prepared by Mr. Steinholt examining the movement of Willbros' stock price compared to the overall market and an industry peer group following the event.  Based on this analysis, the Plan of Allocation applies the amount of fraud-caused inflation in Willbros' common stock at: (i) the outset of the Settlement Class Period (2/28/14); (ii) following the issuance of Willbros' 2Q14 earnings report belatedly revealing the Seaway problems and losses (8/4/14); (iii) following the announcement of the problems and losses on the Sunoco project and the restatement of 2Q14 results (10/21/14); (iv) following the subsequent revelation of the Company's internal control problems related to project management (11/12/14) and the announcement of a broader restatement encompassing 1Q14 results (12/4/14); and (v) prior to

---

[4]     The summary of the Plan of Allocation provided herein is intended only to explain the basis on which the plan was developed in order to assist the Court in evaluating the fairness, reasonableness, and adequacy of the proposed Settlement.  Nothing set forth herein is intended to, or does, modify or affect the interpretation of the Plan of Allocation, which is set forth in full in Ex. A to the accompanying Declaration of Carole K. Sylvester Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date, and will be applied by the settlement administrator according to its express terms.

the end of the Settlement Class Period (3/17/15) when the Company's liquidity problems and related internal control weaknesses were revealed.  *See* Sylvester Decl., Ex. A (Inflation Table).

116.    The Plan of Allocation apportions damages to Settlement Class Members who retained their Willbros shares at the end of the Settlement Class Period based on the amount of inflation on the date they purchased their shares (*i.e.*, the amount they overpaid for their shares) limited by the statutory 90-day bounceback rule.  Settlement Class Members who sold their shares prior to the end of the Settlement Class Period are allocated damages based only on the inflation associated with the corrective events that occurred prior to their sale.  Recovery for all Settlement Class Members is limited to their actual out-of-pocket losses.

117.    In addition, the Plan of Allocation requires that 80% of the Settlement Amount be distributed to Claims based on purchases of Willbros' stock between August 5 and December 4, 2014, which is the period during which purchasers have potentially recoverable damages based upon the claims that were upheld by the Court in its ruling on Defendants' motion to dismiss.  The remaining 20% of the Settlement Amount is to be distributed to Settlement Class Members based on purchases of shares before August 5, 2014 or after December 4, 2014, which encompasses the periods during which purchasers would have potentially recoverable damages only if Plaintiffs' motion to amend was granted and the previously dismissed claims concerning the Seaway project and the adequacy of the Company's liquidity were reinstated and overcame any motion to dismiss that was filed by Defendants.

118.    Based on the expert analyses and Lead Counsel's experience in this and other securities actions, and their understanding of the factual circumstances giving rise to this Action, the legal issues involved, and the risks of continued litigation, including the risks to both liability and damages, Lead Counsel believes that the Plan of Allocation provides a fair, reasonable, and adequate

method of compensating Settlement Class Members for the economic harm they suffered as a result of the fraud alleged in the Action.

### E.    Reasonableness of Fees and Costs

119.    The successful prosecution of this Action required Lead Counsel and their para-professionals to perform 10,111 hours of work valued at $6,017,047 and incur $447,021 in expenses, as detailed in my accompanying declaration.  As detailed in the Declaration of Jason A. Richardson in support of the application for an award of fees and expenses, Liaison Counsel expended a total of 61 hours in attorney and para-professional time valued at $33,156 and incurred $90 in expenses assisting in the litigation of this Action and in obtaining the Settlement.

120.    Based on the extensive efforts on behalf of the Settlement Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and has requested a fee in the amount of 30% of the Settlement Fund.  In light of the nature and extent of the Action, the diligent prosecution of the Action, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying motion for approval of the fee award, Lead Plaintiffs and Lead Counsel believe that the requested fee of 30% of the Settlement Fund is fair and reasonable.

121.    A 30% fee award is justified by the specific facts and circumstances in this case and the substantial risks that Plaintiffs had to overcome at the pleadings, class certification and discovery phases of the Action, and to prepare to overcome at summary judgment and trial, as set forth herein. As set forth herein, the $10 million cash Settlement was achieved as a result of extensive and creative prosecutorial efforts, contentious and complicated motions practice, years of hard-fought discovery, and analysis of voluminous evidence, as detailed herein.

122.    The Settlement Amount, $10 million, represents approximately 40% of the maximum damages that Plaintiffs could reasonably expect to be recovered at trial if their motion to amend is

- 41 -

denied, and exceeds the amount that could be recovered under the analysis of Defendants' expert. If the jury were to reject some of Plaintiffs' allegations of fraud for reasons described above, the amount of damages recovered would have been significantly less, and the percentage recovery under the Settlement proportionally higher, than stated above.

123.    This Action was prosecuted by Lead Plaintiffs' Counsel on an "at-risk" contingent fee basis. Lead Plaintiffs' Counsel fully assumed the risk of an unsuccessful result. Lead Plaintiffs' Counsel have received no compensation for their services during the course of this Action and have incurred significant expenses in litigating for the benefit of the Settlement Class. Any fees or expenses awarded to Lead Plaintiffs' Counsel have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

124.    This Action could not have been successfully prosecuted without the substantial participation and assistance of the Lead Plaintiffs, who spent significant time monitoring the Action, consulting with Lead Counsel regarding case developments and prospects for settlement, and participating in discovery to demonstrate the typicality of their claims, the adequacy of their representation, and the suitability of this case for litigation on a class-wide basis. The time spent by Lead Plaintiffs in doing so, as reflected in the accompanying Declarations of Sharon Maas and Gerard J. Grysko submitted contemporaneously herewith, was both reasonable and necessary to the prosecution of this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 28, 2018, at San Francisco, California.

*s/ Dennis J. Herman*
_____
DENNIS J. HERMAN

- 42 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 28, 2018.

s/Dennis J. Herman
DENNIS J. HERMAN

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: dennish@rgrdlaw.com

# Mailing Information for a Case 4:14-cv-03084 Walters v. Willbros Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J Black**
  kennyb@rgrdlaw.com

- **Willie C Briscoe**
  wbriscoe@thebriscoelawfirm.com,bthompson@thebriscoelawfirm.com

- **Douglas R Britton**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

- **Paul R Elliott**
  paul.elliott@bakerbotts.com,paul-elliott-4394@ecf.pacerpro.com

- **James L Gascoyne**
  gascoyne@gbpclaw.com

- **Benjamin A. Geslison**
  ben.geslison@bakerbotts.com,ben-geslison-8078@ecf.pacerpro.com,starla.barker@bakerbotts.com

- **R. Dean Gresham**
  dean@stecklerlaw.com

- **Amy Pharr Hefley**
  amy.hefley@bakerbotts.com,amy-hefley-7007@ecf.pacerpro.com,leigh-ann-bunker-8737@ecf.pacerpro.com,leigh.ann.bunker@bakerbotts.com

- **Dennis J Herman**
  dennish@rgrdlaw.com,smorris@rgrdlaw.com,E_File_SD@rgrdlaw.com,ptiffith@rgrdlaw.com,E_File_SF@rgrdlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Matthew S. Melamed**
  mmelamed@rgrdlaw.com

- **Jason Anthony Richardson**
  jason.richardson@mhllp.com,bettina.chavez@mhllp.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **David James Sacks**
  david@sackslawfirm.com,brandaldousay@sackslawfirm.com

- **David D Sterling**
  david.sterling@bakerbotts.com,david-sterling-4418@ecf.pacerpro.com,leslie.buenzow@bakerbotts.com,leigh-ann-bunker-8737@ecf.pacerpro.com,leigh.ann.bunker@bakerbotts.com,leslie-buenzow-9672@ecf.pacerpro.com

- **Ellen Gusikoff Stewart**
  e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)